AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Western District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (405) 546-8691 IN THE CUSTODY OR CONTROL OF AT&T | ) ) ) ) ) ) Case No. MJ-24- 63-AMG |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Western _____ District of _____ Oklahoma _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2422(b) | Coercion and Enticement of a Minor |

The application is based on these facts:

See Affidavit of Special Agent Shana Terry, FBI, which is attached and incorporated by reference herein.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of  365  days (give exact ending date if more than 30 days:  01/24/2025  ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Shana Terry, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  1/24/24

_____
*Judge's signature*

City and state:  Oklahoma City, Oklahoma

AMANDA MAXFIELD GREEN, U.S. MAGISTRATE JUDGE
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (405) 546-8691 IN THE CUSTODY OR CONTROL OF AT&T** | **Case No. _____**<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Shana M. Terry, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this Affidavit in support of an application for a search warrant for information associated with a certain cellular device assigned with call number **(405) 546-8691** (hereinafter, the **"TARGET CELLPHONE"**) that is in the custody or control of AT&T, a wireless communications service provider that accepts process through their Global Legal Demands Center located at 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida 33408. As a provider of wireless communications service, AT&T is a provider of "electronic communications service," as defined in 18 U.S.C. § 2510(15).

2.     The information to be searched is described in the following paragraphs and in Attachment A. This Affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require AT&T to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B,

government-authorized persons will review the information to locate the items described in Section II of Attachment B.

3.    Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definition of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act, *see* 18 U.S.C. §§ 3121–3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute, including a certification from an attorney for the government that the information likely to be obtained by the requested pen register and trap-and-trace device is relevant to an ongoing criminal investigation. *See* 18 U.S.C. § 3123(b)(1).  That certification is attached as Attachment C.

4.    In sum, this Affidavit is made in support of an application for three distinct items: (1) a pen register and trap-and-trace device on the **TARGET CELLPHONE**, pursuant to 18 U.S.C. §§ 3121–3127; (2) a "ping" on the **TARGET CELLPHONE**, pursuant to 18 U.S.C. § 2703 and Fed. R. Crim. P. 41(c); and (3) an order for historical and prospective cell site data for the **TARGET CELLPHONE**, pursuant to 18 U.S.C. § 2703(d).

5.    I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since February of 2019.  In this capacity, my responsibilities include the investigation of possible

2

violations of federal law, including the investigation of child exploitation. During my career, my investigations have included the use of various surveillance techniques and the execution of various search, seizure, and arrest warrants.

6.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and records. This Affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.      Based on the facts set forth in this Affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 2422(b), coercion and enticement of a minor, has been committed by **SAI KUMAR KURREMULA ("KURREMULA")**, date of birth xx/xx/1993. There is probable cause to search the information described in Attachment A to assist and aid in the location of, and in establishing the pattern of life of, **KURREMULA** as further described in Attachment B.

8.      This Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. §§ 2711 & 3127. Specifically, this Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. §§ 2711(3)(A)(i) & 3127(2)(A)(i).

## PROBABLE CAUSE

*R.W. and Katie Anderson*

9.      On October 25, 2023, R.W., a fourteen-year-old female, was forensically interviewed at the FBI's Lawton Resident Agency after being identified as a potential victim of sexual exploitation by an FBI subject living outside the United States. During

the interview, R.W. revealed that, in addition to the overseas subject, she had also been contacted by a Snapchat user[1] approximately two years ago, utilizing the Snapchat account "k_anderson21278," with display name Katie Anderson ("Anderson"). R.W. provided information about her interactions with Anderson during the forensic interview, but due to the poor audio quality of the recording, she also provided clarifying information during a second forensic interview on November 21, 2023.

10.    R.W. was contacted by Anderson through Snapchat approximately two years prior to the forensic interview. Through R.W.'s initial communications with Anderson, she told him she was twelve years old. Anderson admitted to R.W. that his name on Snapchat was fake but would not reveal his real name. Initially, the conversation between R.W. and Anderson was routine, but then Anderson began asking her to take nude photographs of herself and send them to him via Snapchat. Anderson then began pressuring R.W. to participate in sexually explicit video calls with him via Snapchat. R.W. began crying during the interview when asked to describe the video calls with Anderson. R.W. estimated Anderson pressured her to participate in a video call with him approximately once a week over the time period of approximately one year. Every video call would last approximately ten to fifteen minutes and included Anderson making R.W. remove her clothes from the waist up, and on one occasion, he made her show her genitals

---

[1] Snapchat is a free mobile application made by Snap, Inc. and is available for download through the Apple App Store and Google Play Store. The Snapchat application is used to share information through photos, videos, and chat messages, as well as to enable voice and video calls.

as well and instructed her to touch herself. Sometimes, R.W. cried during the calls because she did not like doing them, and Anderson would tell her, "Don't cry" and acted as if he cared.

11.     Anderson never showed his face on the video calls and refused to provide R.W. with any real information about himself. Anderson would say only that he lived in Oklahoma City, despite R.W.'s attempts to obtain his address. R.W. believed Anderson lived with roommates because he sometimes ended calls with her by saying his roommates were home.

12.     R.W. recalled a time when she argued with Anderson because she did not want to participate in a video call with him. Anderson sent her a video he had previously recorded of her and threatened to come to her house and show it to her parents if she did not do a video call with him. The recording showed a previous video call between R.W. and Anderson, which Anderson had recorded with a different phone. In the call, R.W. was nude above the waist.

13.     Out of fear, R.W. continued participating in video calls with Anderson. Any time she tried to refuse, Anderson used the threat of showing the sexually explicit video to her parents. On one occasion, Anderson even sent her a picture of himself driving and stated, "I'm coming."

14.     On one occasion, R.W. was arguing with Anderson about having a video call, and Anderson stated, "I have other girls." R.W. did not know anything about the other girls Anderson referenced.

15. In the summer of 2023, Anderson wanted to meet R.W. in person and threatened to show her parents the video if she did not agree to it. Anderson told R.W. he wanted her to touch his penis with her hands. When he arrived, R.W. did not want Anderson to pull into the driveway of her home, so she told him to park down the street in front of the housing community's office building. In the back seat of Anderson's car, Anderson began touching R.W.'s chest and kissing her. He took off her shirt, pants, underwear, and bra. He touched her vagina with his hand and then penetrated her vagina with his penis. Anderson also forced R.W. to perform oral sex on him. R.W. cried as these things were happening, but she did not think Anderson noticed. R.W. recalled that Anderson used a condom when he had sex with her.

16. R.W. and Anderson met in person again two or three weeks later. They met at the same location, and Anderson did the same things to her. Although this time, Anderson brought energy drinks with him and made R.W. drink them. R.W. recalled they said "Monster" on them, and they tasted "gross." Anderson said they would give her energy.

17. R.W. recalled the first time she met Anderson in person, he drove a large black car, and the second time he drove a white vehicle with a round top, possibly an SUV. She noticed both vehicles had "window covers" that could be pulled down over the windows.

18. R.W. described Anderson as having dark skin and black hair, with "bushy" eyebrows. He was Indian (from the country of India) and spoke with a thick accent. He

possibly had short facial hair around his chin and up toward his ears.[2] R.W. stated that she blocked Anderson in October 2023.

19.     A query of Snapchat username "k_anderson21278" in FBI databases revealed an anonymous complaint reported to the FBI on October 1, 2022 via the National Threat Operations Center. The anonymous complainant claimed to be thirteen years old and reported on an adult male using the Snapchat account "k_anderson21278." The complainant stated, "[t]his adult male has revealing photos of me and is threading (sp) me that if I don't do a revealing video call he will come to my house." The only contact information the complainant provided was an e-mail address. An FBI Special Agent made numerous attempts to contact the complainant via the provided e-mail address in order to further substantiate the allegations, but no response was received.

20.     R.W.'s parents provided the FBI consent to search R.W.'s phone, an iPhone 14. Contents of the iPhone 14 were extracted and made available for review via Cellebrite, a cell phone extraction program widely used by law enforcement to extract and organize the contents of seized cell phones. The phone extraction listed two Apple IDs associated with the phone, one of which was the same as the e-mail address provided by the anonymous complainant described in the previous paragraph, identifying R.W. as being the complainant.

---

[2] It should be noted that FBI Special Agent Nathan Wilkins, who observed the first forensic interview of R.W., documented Anderson's race as being white. Special Agent Wilkins later realized he had inadvertently added the detail to the report because of his prior conversation with R.W.'s parents, who thought R.W. told them Anderson was a white male. This detail was clarified with R.W. in her second forensic interview, where she stated Anderson was Indian.

21.     Although the iPhone 14 did not contain the contents of communications between R.W. and Anderson, it did acknowledge the existence of communication between them. The iPhone 14 documented a Chat between R.W.'s Snapchat account and Snapchat user "k_anderson21278," beginning on March 9, 2023 and ending on September 25, 2023. In addition, Katie Anderson is listed in the Contacts of the iPhone 14.     InteractionC recorded 969 incoming interactions from the contact.[3]

22.     A screenshot was located on the iPhone 14 depicting the Snapchat Chat page. The screenshot is pictured on the following page:

---

[3] According to the glossary on Cellebrite's website, www.cellebrite.com, InteractionC is a database, common to Apple devices, that tracks interactions, such as text messages of the user, with recent contacts.



23.     Snapchat user Katie Anderson is listed on the Chat page, with a smiling face emoji pinned to the bitmoji, which, according to Snapchat's support page, help.snapchat.com, indicates the user is one of your "Best Friends." Snapchat uses an algorithm to determine a user's "Best Friends," which takes into consideration the number of Snaps sent to each other, how many days in a row the users have communicated with each other, as well as other factors. When a user is one of your "Best Friends," it indicates you send a lot of Snaps to the user, but they are not your "#1 Best Friend."

24.     According to Snapchat's support page, the empty blue arrow pictured next to Anderson's bitmoji indicates Anderson opened a Chat.

***K.M. and Katie Anderson***

25.    On November 8, 2023, a federal Search and Seizure Warrant was served to Snap Inc. for information related to Snapchat account "k_anderson21278." A review of the provided records showed there were no saved communications between Anderson's account and R.W.'s account. However, numerous Chat messages were provided between Anderson's account and an account later identified as belonging to a different individual, K.M. The messages involve sexually explicit conversations and span the short time period between December 8, 2022 and December 14, 2022. In the messages, Anderson asks K.M to show him her "ass" and "titties." When K.M. says she is not in a private location, Anderson asks if she has any saved photographs of her or her friends. From context, it appears that some of the messages are sent during the course of video calls between Anderson and K.M. Anderson instructs K.M. what he wants to see her do during the calls, such as "Lemme see the ass," and "Move back babe, Can't see the full tits." Anderson also attempts to get K.M. to meet him in person to have sex. However, there is nothing in the chat to suggest they did meet in person. The messages do not provide any identifying information about either user, except when K.M. asked what Anderson looked like, he referred to himself as "black."[4]

26.    Utilizing subscriber information related to K.M.'s Snapchat account, K.M. was identified and a forensic interview was conducted with her on January 11, 2024.

---

[4] It is also noted that in a Chat dated December 25, 2022, Anderson shared messages with another Snapchat user in which he stated he was from Edmond, Oklahoma.

During the interview, K.M. recalled a man initiating contact with her via the Snapchat application. A series of Chat messages (previously referred to in paragraph 25) was shown to K.M. during the interview, and she confirmed it was her account listed in the communications and that she had been participating in the conversations. K.M. was thirteen years old at the time of the messages. K.M. explained that the conversation with "k_anderson21278" began in a routine way, but then he started asking her to send him sexually explicit photographs and videos of herself. K.M. could vividly recall that, when she refused to send him what he wanted, he told her that if she did not send what he was asking for, he would "shoot up" her family. Anderson deleted the threatening message shortly after sending it. K.M. believed Anderson would follow through with his threat, and out of fear, she continued to send him the photographs and videos he wanted, to include sexually explicit images of her breasts and genitals. Anderson instructed K.M. to play with herself in the videos and made her call him "daddy."

27.    K.M. recalled that periodically, Anderson initiated video calls with her. If she did not answer the call, he would continue to call her over and over. K.M. recalled a particular video call where Anderson was in the shower and K.M. noticed he was wearing sandals. In the video call, the man was playing with his penis with his hand. K.M. recalled the man making a "come here" gesture with his hand, indicating he wanted K.M. to join him. Eventually, K.M. stated that something white came out of the man's penis and went down the shower drain.

28.    K.M. recalled Anderson had initially sent her a picture of himself, which showed his skin tone to be white. However, when K.M. saw Anderson in real-time during

11

the video call, she described his skin tone as "really light brown" and recalled that he spoke with an accent.

29.    K.M. believes Anderson used other Snapchat accounts to contact K.M. For example, K.M. recalled having similar communication with a man whose name started with "R". "R" made K.M. send the same type of photographs and videos of her breasts and genitals as the first man.

30.    K.M. believes that the users of one or both of the Snapchat accounts were saving her pictures and videos. She recalled the user of one of the accounts threatening to show up at her house and show her father one of her sexually explicit photographs.

***Corroboration of Kurremula's Connections to the Snapchat Accounts***

31.    On October 26, 2023, an Administrative Subpoena was served to Snap, Inc. requesting subscriber information for Snapchat user "k_anderson21278" for the time period of October 1, 2022 to October 26, 2023. Returned records revealed that the account for "k_anderson21278" was created on December 21, 2021 and was last active on October 26, 2023. Further investigation has also revealed activity on the account as recently as November 11, 2023. The IP address used to create Snapchat account "k_anderson21278" on December 21, 2021 was 70.174.239.59.

32.    An Administrative Subpoena served to Cox Communications for subscriber information associated with the IP address during the time period of December 19, 2021 to December 23, 2021 (targeting the creation date of the "k_anderson21278" account) revealed the following registration information:

- Name: Bhargave Ramulu Pullaboina

- Address: 15716 Potomac Dr., Edmond, OK 73013-0026

- Account Status (currently): Disconnected

33.     According to U.S. State Department records, Bhargave Pullaboina previously resided in the U.S. on a Temporary Work Visa from India. Records indicate he left the United States on October 14, 2023.

34.     IP address data from Snap Inc. revealed a second IP address as well. It showed that the IP address 70.174.239.84 was the last recorded IP address used by Snapchat account "k_anderson21278" on October 26, 2023 and was connected to over 350 occurrences of account activity during the month of October 2023 and over 3,400 occurrences of account activity from October 20, 2022 to October 26, 2023.

35.     Accordingly, an Administrative Subpoena was served to Cox Communications for subscriber information related to IP address 70.174.239.84 for the timeframe of October 1, 2022 to October 26, 2023. The following information was provided by Cox Communications:

- Name: **Sai KURREMULA**

- Address: 15716 Potomac Dr., Edmond, OK 73013-0026 (henceforth "the Potomac Drive address")

- Home Phone Number: 405-546-8691 (the **TARGET CELLPHONE**)

- Account Status: Active

36.    The information received from Cox Communications indicated that both IP addresses registered to the Potomac Drive address were associated with the same modem, and, at the end of August 2022, the name on the account changed from Bhargave Pullaboina to **KURREMULA**.

37.    According to public records made available by the Oklahoma County Assessor, **KURREMULA** purchased the house located at the Potomac Drive address in September of 2020.

38.    On numerous dates between October 31, 2023 and December 19, 2023, FBI Special Agents drove by the Potomac Drive address, and each time, only the following two vehicles were in the driveway:

- White Toyota Prius registered to **KURREMULA**
- Black Audi AQ7 registered to **KURREMULA**

39.    According to U.S. State Department records, **KURREMULA** is currently residing in the U.S. on a Temporary Work Visa from India.

40.    Multiple media files were provided by Snap Inc. pursuant to the Search Warrant of the "k_anderson21278" account. A review of the media files revealed that twelve media files were transferred between "k_anderson21278" and Snapchat account "ryan_121312" on December 12, 2022 and December 13, 2022. Eleven of those files are photographs taken of a mobile phone screen showing the breasts of a female wearing a bra. The female's face is not shown. The remaining media file is a photograph showing a male holding his erect penis in his hand. The male's face is not shown.

14

41.     An Administrative Subpoena was served to Snap Inc. for subscriber information associated with Snapchat account "ryan_121312" for the time period of December 12, 2022 and December 13, 2022. Returned records indicated the account was created on June 23, 2022. IP address data revealed Snapchat activity was conducted with the account on two occasions utilizing IP address 70.174.239.84, which is the same IP address connected to activity on the "k_anderson21278" Snapchat account, resolving back to the Potomac Drive address. Further review of the records reveals that both "k_anderson21278" and "ryan_121312" share the same creation IP address, also resolving back to the Potomac Drive address.

42.     Shortly after receiving subscriber information related to Snapchat account "ryan_121312," Snap Inc. provided additional information to FBI Liaisons at NCMEC regarding media files which were saved, and/or shared, and/or uploaded to the account and contained child sexual abuse material.  On the dates of November 4, 2023 and November 11, 2023, "ryan_121312" saved, and/or shared, and/or uploaded seven media files fitting the characterization of a "Sex Act" involving a "Pubescent Minor" and 22 media files fitting the characterization of "Lascivious Exhibition of a Pubescent Minor."

43.     A review of the media files revealed they consisted of 25 images and five videos.  All media files appeared to be photographs or videos of a separate mobile phone communicating within the Snapchat application.  Most images and videos depict a female rubbing and manipulating her bare breast(s) with her hand. The female's face is not shown.

44.     A Federal Search Warrant was served to Snap, Inc. for records related to Snapchat account "ryan_121312."  The most recent IP address used to log into the account

was listed as 70.174.239.84, resolving to the Potomac Drive address, on December 4, 2023. The returned records included over 1,700 media files (photographs and videos), many of them related to the user's communication with young females. The majority of media files consisted of photographs or videos recorded by a separate device, indicating that the user surreptitiously recorded videos calls and chats with the girls. The media files are consistent with a sextortion scheme, in that the surreptitious recordings show the user clicking in and out of his chats with numerous girls, in an apparent effort to clearly show which accounts sent the videos. In addition, screenshots were saved from the Google Maps application that show the location of specific addresses.

45.     It is also apparent from the records that the user of "ryan_121312" falsely represented himself to the girls he communicated with through Snapchat. Each time he introduced himself to a female, he sent a picture of a young white male to portray himself. According to Chat messages, he routinely represented himself to be a 13- to 15-year old boy, which varied depending upon the ages provided by the girls.

46.     The media and Chat files associated with Ryan's account also identified two additional Snapchat accounts that are believed to have been utilized by the same individual: "nickdrrick" and "patrick_funn." Child Sexual Abuse Material ("CSAM"), in the form of surreptitious recordings of young girls, was routinely transferred between the four accounts. In addition, it appears the user sent himself notes to his other accounts. For example, on March 7, 2023, "k_anderson21278" sent "ryan_121312" a message that simply listed an address, followed by "huswife." On March 8, 2023, "k_anderson21312" sent 22 photographs and 6 videos containing CSAM, all of which appear to be related to a

Snapchat account with Display Name "his Wife." Similarly, notes containing addresses, usernames, and the name of schools, are shared between "ryan_121312," "k_anderson21278," "nickdrrick," and "patrick_funn."

47.     Subpoenas sent to Snap Inc. for subscriber information revealed that Snapchat account "nickdrrick" was created on October 25, 2022, and Snapchat account "patrick_funn" was created on September 12, 2023. Both accounts were created using IP address 70.174.239.84, which resolves back to the Potomac Drive address in **KURREMULA**'s name.

48.     Based on the statements provided by R.W. and K.M., the IP address data related to the accounts, the content of Chat messages, and the media files transferred between accounts, I believe it is probable that **KURREMULA** utilized the four Snapchat accounts previously listed in a criminal scheme to blackmail, or sextort, minor females and that he is using the **TARGET CELLPHONE** to affect his scheme.

49.     On January 2, 2024, a trash cover was conducted at the Potomac Drive address.   A review of the items in the trash can revealed numerous pieces of discarded mail.  Many items listed **KURREMULA** as the intended recipient.   It appeared that two adult females also received mail at the address, one of whom was listed as **KURREMULA**'s spouse on a healthcare claims document.   One item of mail was addressed to an unknown individual with the first name "Sunny." The contents of the trash contained no evidence of any other adult male living in the residence other than **KURREMULA**.

50.    An item of interest identified during the trash cover was a UPS envelope addressed to **KURREMULA** at the Potomac Drive address.  The address label listed the **TARGET CELLPHONE** underneath **KURREMULA**'s name.  The telephone number matches the telephone number previously provided by Cox Communications in connection with the IP address registered to **KURREMULA**.

51.    Subscriber information obtained from AT&T on January 18, 2024, via an Administrative Subpoena, revealed that the Financial Liable Party, as well as the Billing Party, for the **TARGET CELLPHONE** is listed as Bhargave Ramul Pullaboina at address 17740 MacArthur Park Road, Edmond, Oklahoma 73012.  User Information lists one individual: Sai Kumar **KURREMULA** at address 15716 Potomac Drive, Edmond, Oklahoma 73013.  Subscriber information further revealed that, as of January 18, 2024, the phone was still actively in use and was documented as making a call to India on January 17, 2024.

52.    Finally, **KURREMULA** has taken extensive efforts to conceal his identity.  As stated, **KURREMULA** has routinely utilized false photographs, a fictitious age, and an alias when communicating with victims.  He has also made a vigilant effort to refrain from showing his face to victims during video calls.  Physical and digital surveillance of the residence has proven to be problematic due to the specific location and circumstances.  In addition, employment records indicate **KURREMULA** works remotely, suggesting he may not have a reason to leave his residence at a regularly scheduled time.

53.    I believe that "pinging" or obtaining **KURREMULA**'s cellular telephone locations will assist law enforcement in locating him and will assist in law enforcement

surveillance by providing continued coverage of **KURREMULA**'s whereabouts and any travel. Within the next 45 days, the FBI plans to submit for judicial approval and, pending authorization, execute a Federal Search and Seizure Warrant at the Potomac Drive address. It is critical that **KURREMULA** is present at the residence at the time of the Search Warrant execution in order to seize any device(s) he may have on his person. Historical geolocation data, as well as ongoing location data, will also assist in constructing a pattern of life for **KURREMULA**. A pattern of life will assist law enforcement in determining the safest approach to executing the warrant, as well as to ensure **KURREMULA** is at the residence at the time of the warrant execution.

54.     Through database checks, I have confirmed that AT&T provides service for the **TARGET CELLPHONE**. In my training and experience, I have learned that AT&T is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be ten (10) or more miles apart in rural areas. Furthermore, the tower closest to a

wireless device does not necessarily serve every call to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

55.     Based on my training and experience, I know that AT&T can collect cell-site data about the **TARGET CELLPHONE**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; (5) the cell tower roundtrip network measurements from tower to device and back to tower, commonly referred to as Timing Advance data; and (6) the duration of the communication. I also know that wireless providers such as **AT&T** typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

56.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers—as transmitted from a

cellular device to a cellular antenna or tower—can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

57.     Based on my training and experience, I know wireless providers such as **AT&T** typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as **AT&T** typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training, and experience of other law enforcement officers, this information may assist in locating and tracking **KURREMULA** in order to develop a pattern of life and to ensure he is at his residence at the time of the Search Warrant execution. In my training and experience, this information may also constitute evidence of the crimes under investigation because the information can be used to identify the **TARGET CELLPHONE**'s user or users.

58.     Based on my training and experience, the combination of both historical and prospective location information is helpful in locating individuals. The historical location information from cellular phones can help establish a pattern of life, while prospective location information—including cell-site information, phone pings, and timing advance measurements/distance-to-tower measurements—can help provide more precise real-time

21

information regarding the location of the **TARGET CELLPHONE's** user. To help ensure that **KURREMULA** is located and a pattern of life is established, I am requesting precise location information for the next forty-five (45) days for the **TARGET CELLPHONE**.

### AUTHORIZATION REQUEST

59.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41. The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A for each communication to or from the **TARGET CELLPHONE**, without geographic limit, for a period of forty-five (45) days pursuant to 18 U.S.C. § 3123(c)(1).

60.     I further request, pursuant to 18 U.S.C. § 2703(b)(1)(A), that this Court find that the government is not required to provide notice of this warrant to the subscriber, customer, or person who was monitored. I also request, pursuant to 18 U.S.C. § 3123(d), that AT&T be ordered not to disclose to the listed customer or any other person the existence and/or use of the pen register and trap-and-trace device sought herein. Additionally, there is reasonable cause to believe that providing immediate notification of the warrant to the subscriber, customer, or person who is being monitored may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber, customer, or user of the **TARGET CELLPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from

22

prosecution. *See* 18 U.S.C. § 2705(a)(2). Therefore, I request that the Court order AT&T not to notify any other person of the existence of this warrant and order for a period of one year from the date the requested warrant is issued, except that the service provider may disclose this warrant and order to an attorney for the service provider for the purpose of receiving legal advice. As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

61.    I further request that the Court direct AT&T to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on AT&T, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

62.    I further request that the Court order that all papers in support of this application, including the Affidavit and search warrant, be sealed for a period of twelve months from the date the requested warrant is issued, or until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor

known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents as their premature disclosure may jeopardize this investigation.

Respectfully submitted,

Shana M. Terry
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on ___24th___ January, 2024.

AMANDA MAXFIELD GREEN
UNITED STATES MAGISTRATE JUDGE

24

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number **(405) 546-8691** (the "**TARGET CELLPHONE**") whose wireless service provider is AT&T (the "Provider"), a company that accepts process at their Global Legal Demands Center located at 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida 33408

2. Records and information associated with the **TARGET CELLPHONE** that is within the possession, custody, or control of the Provider.

## ATTACHMENT B

### Particular Things to Be Seized

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the **TARGET CELLPHONE** listed in Attachment A:

a.     The following information about the customers or subscribers associated with the **TARGET CELLPHONE** for the time period June 1, 2023 to the present:

    i.     Names (including subscriber names, user names, and screen names);

    ii.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.     Local and long-distance telephone connection records;

    iv.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.     Length of service (including start date) and types of service utilized;

    vi.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity

Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.     Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii.     Means and source of payment for such service (including any credit card or bank account number) and billing records;

ix.     All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **TARGET CELLPHONE**, including:

     1.     the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

     2.     information regarding the cell tower and antenna face (also known as "sectors" through which the communication were sent and received; to include the cell tower roundtrip network measurements from tower to device and back to tower, commonly referred to as Timing Advance data (RTT, PCMD, TrueCall, LOCDBOR, etc.).

b.     The following information about the customers or subscribers associated with the **TARGET CELLPHONE** for a period of 45 days from the issuance of the warrant, including:

i.     Names (including subscriber names, user names, and screen names);

ii.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.     Local and long-distance telephone connection records;

iv.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.     Length of service (including start date) and types of service utilized;

vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

c.   Prospective information about the location of the cellular phone associated with the **TARGET CELLPHONE** for a period of 45 days (during all times of day and night) from the issuance of the warrant, including:

i.    E-911 Phase II data;

ii.   GPS data to include cell tower sector information;

iii.  Latitude-longitude data;

iv.   Other precise location information, including engineering data to include but not limited to RTT records, PCMD records, Location Database of Records (LOCDBOR) and/or NELOS records, TrueCall records, and all other records containing timing advance measurements and distance-to-tower measurements for all technologies (CDMA, GSM, UMTS, LTE, etc.); and

v.    Pen Register / Trap and Trace device with prospective cell site information or data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the **TARGET CELLPHONE** during any voice, SMS, and/or data transmission, including but not limited to engineering data which would include RTT records, PCMD records, Location Database of Records (LOCDBOR) and/or NELOS records, TrueCall records.

3

**II.    Information to Be Seized by the Government**

All information described above in Section I that would assist and aid in the location of **KURREMULA**, as well any evidence of violations of 18 U.S.C. § 2422(b), coercion and enticement of minors.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by AT&T in order to locate the things particularly described in this Warrant.

4

## ATTACHMENT C

### 18 U.S.C. § 3122 Certification

In support of this application, and pursuant to 18 U.S.C. § 3122, I state that I am an "attorney for the Government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure. I certify that the information likely to be obtained from the requested warrant is relevant to an ongoing criminal investigation being conducted by the Investigating Agency of the Target Subject for violation(s) of the Target Offense(s).

I declare under penalty of perjury under the laws of the United States of America that the foregoing paragraph is true and correct.

1/24/24
DATE

ELIZABETH JOYNES
Assistant United States Attorney